IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

GREGORY SCOTT ETZKORN                                                         PLAINTIFF

v.                                    Civil No. 09-2121

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                                DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Gregory Etzkorn, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying his claims for disability income benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

I.   **Procedural Background:**

The plaintiff filed his applications for DIB and SSI on April 4, 2007, alleging an onset date of April 4, 2007, due to seizure disorder, anxiety disorder with panic attacks, headaches, confusion, disorientation, loss of memory, and the residuals of gangrene in his left leg causing frequent falls resulting in loss of consciousness. Tr. 24, 37, 104-111, 112-115, 148-149, 182. His applications were initially denied and that denial was upheld upon reconsideration. Tr. 48-51. Plaintiff then made a request for a hearing by an Administrative Law Judge (ALJ). An administrative hearing was held on October 23, 2008. Tr. 15-47. Plaintiff was present and represented by counsel.

At this time, plaintiff was 38 years of age and possessed a high school education and two years of college credit. Tr. 19, 21. He had past relevant work experience as a dry wall hanger. Tr. 136-139, 184.

On August 29, 2008, the ALJ found that plaintiff's chronic seizure syndrome and anxiety disorder were severe, but did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. Tr. 57-58. After partially discrediting plaintiff's subjective complaints, the ALJ determined that plaintiff retained the residual functional capacity to perform work at all exertional levels, but must avoid all exposure to hazards such as unprotected heights or heavy machinery. Tr. 59. The ALJ also indicated that he was prohibited from driving as part of his work and could only perform unskilled work. Tr. 59. With the assistance of a vocational expert, the ALJ found plaintiff could perform work as a cashier, mail clerk, janitor, and hand packager. Tr. 63.

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on January 30, 2009. Tr. 4-5. Subsequently, plaintiff filed this action. ECF No.1. This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the case is now ready for decision. Docs. 7, 8.

## II.     Applicable Law:

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d

964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his or her disability, not simply their impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national

3

economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

### III.    Evidence Presented:

Records indicate that plaintiff had a history of seizure disorder and anxiety disorder. Tr. 192-201, 217-225. Dr. William Webb, plaintiff's treating doctor, prescribed Xanax and Dilantin. Tr. 192-201, 217-225. Progress reports dated between February 2004 and November 2005 reveal completely normal physical exams with no reports of seizure activity. Tr. 251-255. An EEG and CT scan performed in 2001 were both within normal limits. Tr. 201, 215, 216. An MRI of the brain was also normal. Tr. 221.

Prior to the relevant time period, plaintiff was also treated for back pain, after playing hard and injuring his back. Tr. 195, 249-250. Dr. Webb diagnosed him with lumbar pain and muscle spasms. He prescribed Percocet and local heat intermittently. Tr. 195.

On August 14, 2006, Dr. Marcus Poemoceah, an associate of Dr. Webb, voiced his belief that plaintiff had chronic seizure disorder related to anxiety. Tr. 248. He noted that plaintiff had experienced no seizures since his last visit with Dr. Webb in April. Tr. 248.

On September 16, 2006, plaintiff indicated that he was doing very well. Tr. 246-247. He told Dr. Webb that he was working as a dry wall worker and had been "finishing his work." Plaintiff was given refills of Dilantin and Xanax. Tr. 246.

On January 17, 2007, plaintiff reported having a "small seizure" the week before. Tr. 190-191, 244-245. He had been out of Xanax for several days. Dr. Webb noted that his

4

impairments were fairly well within controlled via Dilantin and Xanax. A physical examination was within normal limits. Dr. Webb diagnosed plaintiff with anxiety and seizure disorder and prescribed refills of Xanax and Dilantin. Tr. 190-191.

On May 9, 2007, plaintiff had been under considerable stress. Tr. 242-243, 489. He had seizure disorder and recent blood work revealed a low Dilantin level. The doctor diagnosed him with seizure disorder and anxiety. He prescribed refills of Dilantin, Xanax, and Percocet. Tr. 242-243, 489.

On May 17, 2007, plaintiff completed a statement indicating that he suffered from seizures, convulsions, and spells. Tr. 140-141. He described the spells as grand mal seizures involving collapse, tongue biting, urinary incontinence, convulsions, foaming of the mouth, lip smacking, and periods of stopped breathing. Plaintiff indicated that he could sometimes tell when a seizure was coming on because he experienced a warming in his head, a sense of deja-vu, and strange feelings of place and time. After a seizure, he stated that he felt terrible, experiencing sleepiness with extreme muscle aches and a headache. Plaintiff also reported feeling embarrassed and sad when his awareness came "back around." He advised that his last seizure had occurred three to four days earlier with the next previous one occurring one week prior. Plaintiff said that he had experienced eight to ten seizures in the previous month and between 35 and 50 over the previous year. He stated that Dr. Webb had prescribed Dilantin and Xanax to treat his condition, and that he last saw the doctor on May 9, 2007. Tr. 140-141.

This same date, Kimberly Wright, plaintiff's fiancé, completed a statement indicating that she had observed him experience approximately 25 seizures over the previous year and seven or eight over the past month, with the last one occurring on May 14, 2007. Tr. 146-147. Ms.

Wright indicated that plaintiff would begin smacking his lips, clapping his hands, and rubbing his hands together just prior to a seizure. His entire body would then tense up and shake for five to seven minutes, his lips would turn blue, he would lose control of his bladder, he would bite his tongue, and he would foam at the mouth. Ms. Wright stated that she ensured that plaintiff took his medication as prescribed, but that the medication did not always control the spells. Tr. 146-147.

On May 19, 2007, Michelle, a friend of plaintiff's fiancé, also completed a statement. Tr. 142-143. She attested to witnessing plaintiff experience a seizure on March 12, 2007. Michelle stated that plaintiff acted as though he were lost in thought, confused, and could not recognize where he was at or what is was about to do. Following this, she indicated that he went into a full body seizure and his lips turned blue for a period of about four minutes. Tr. 142-143.

This same date, Linda Palmore prepared a statement, indicating that she had observed plaintiff experience seizures on five different occasions, two of which occurred in the previous month. Tr. 144. When the seizure first came on, Ms. Palmore stated that plaintiff seemed as if he did not know where was at or what was going on around him. He then began seizing uncontrollably. Following a seizure, Ms. Palmore indicated that plaintiff spit blood and foam out of his mouth, was confused, and did not remember even having a seizure. Tr. 144-145.

On August 14, 2007, plaintiff presented at Dr. Webb's office to have him complete some forms. Tr. 241. Plaintiff stated that he had fallen during a recent seizure and injured his back. As such, Dr. Webb prescribed Percocet and increased plaintiff's Dilantin dosage. Tr. 241.

This same date, Dr. Webb completed a Treating Physician's Report for Seizure Disorder. Tr. 229-230. He documented a frequency of two seizures per week, ten per month and 120 in

the past year. Tr. 229-230. However, Dr. Webb noted that he had not personally observed any of plaintiff's seizures. The seizures were said to include tongue biting, loss of consciousness, urination or defecation, alteration of awareness, postical antisocial behavior, and convulsive seizures. Dr. Webb indicated that postictal residuals included extreme fatigue and hyper somnolence. He had last treated plaintiff on May 9, 2007, with his last medication adjustment occurring February 19, 2004. Tr. 229-230.

On October 30, 2007, Dr, Webb indicated that plaintiff's seizure disorder was well controlled on five Dilantin a day and his anxiety was controlled on his Xanax. Tr. 239-240. An examination was normal, and plaintiff was given refills of Xanax, Dilantin, and Percocet. Tr. 239-240.

On January 28, 2008, plaintiff complained of an upper respiratory infection for several months associated with an occasional productive cough. Tr. 237. An examination revealed increased breath sounds over the upper airways and forced expiratory rhonchi. Dr. Webb diagnosed him with an upper respiratory infection and seizure disorder. He prescribed Doxycycline, Dilantin, and Xanax. Tr. 237. At this time, plaintiff's problem list included, long-term use of other medications, sprain of ankle, struck in sports, anxiety state not otherwise specified, lumbago, spasm of muscle, and other convulsions. Tr. 238.

On April 28, 2008, plaintiff called Dr Webb's office requesting a refill of Xanax. Tr. 235-236. A refill was granted. Tr. 235-236.

On June 3, 2008, plaintiff reported three seizures in the past week. Tr. 231-234. He had been out of Xanax, but was taking the Dilantin regularly. His problem list on that date was

anxiety state, lumbago, spasm of muscle, and convulsions. He was still taking Percocet for pain. Tr. 232. Blood tests showed his Dilantin level was low. Tr. 233.

IV.   **Discussion**:

Plaintiff contends that the ALJ improperly dismissed his subjective complaints, failed to consider evidence which fairly distracted from his findings (medication and side effects, headaches, obesity, and fatigue), assigned an improper RFC to plaintiff without the benefit of an RFC from his treating doctor, improperly weighted the physicians' opinions, and failed to properly develop the evidence.

   A.   **Subjective Complaints/Severity of Impairments:**

When evaluating the credibility of plaintiff's subjective complaints the ALJ is required to make an express credibility determination detailing his reasons for discrediting the testimony. *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

The standard of evaluation is not whether plaintiff experiences pain, but if the pain alleged is intense enough to cause functional limitations. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (holding that the real issue is not whether the plaintiff is experiencing pain, but how severe and whether it prevents his from performing any kind of work).

An ALJ may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ is required to take into account the following factors in evaluating the credibility of a claimant's subjective complaints: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. *See id.* The

ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. *Masterson v. Barnhart,* 363 F.3d 731, 738 (8th Cir. 2004). However, the ALJ need not explicitly discuss each *Polaski* factor. *Strongson v. Barnhart,* 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ only need acknowledge and consider those factors before discounting a claimant's subjective complaints. *Id.* Even so, the ALJ may discount a claimant's subjective complaints if there are inconsistencies between the alleged impairments and the evidence as a whole. *Dunahoo v. Apfel*, 241 F.3d 1033, 1037 (8th Cir. 2001); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).

The record makes clear that plaintiff had been diagnosed with seizure disorder. What is not clear is the frequency or severity of plaintiff's seizures. In testimony, plaintiff claims to suffer from eight to ten seizures per month, yet his medical records suggest that he suffered from far fewer seizures. Dr. Webb's records indicate that plaintiff's condition was well controlled via Xanax and Dilantin. *See Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling."). Between February 2004 and November 2005, plaintiff's physical exams were normal and he reported no seizure activity. Tr. 251-255. In August 2006, the doctor noted that plaintiff had reported no seizure activity since his last appointment, in April. Records from September 2006 indicate that plaintiff was doing very well and working. In January 2007, plaintiff reported experiencing only one "small seizure." Tr. 190-191. It was not until August 2007 that plaintiff complained of further seizure activity and, again, he reported only one seizure. Tr. 241. In October 2007, Dr. Webb again stated that plaintiff's condition was well controlled via Dilantin and Xanax. Tr. 239-240. Then, in June 2008, plaintiff reported three alleged seizures during the

9

previous week. Tr. 231-234. We note that the frequency of seizure activity reported by plaintiff to his doctor does not match the frequency plaintiff reported to the Administration. Had plaintiff been suffering from as many seizures as he now alleges, we believe he would have reported those seizures to his doctor and that those seizures would be recorded in Dr. Webb's progress notes. As they are not, we do not find that plaintiff's testimony concerning the frequency of his seizures was totally credible.

On the isolated occasions plaintiff did report suffering from a seizure, records reveal that plaintiff was not taking the Xanax as prescribed. *See Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) ("A failure to follow a recommended course of treatment . . . weighs against a claimant's credibility."). Lab tests also revealed that plaintiff's Dilantin level was often low, suggesting that plaintiff was not taking his medication as prescribed.[1] Tr. 190-191, 231-234. As it seems clear that plaintiff's condition was amenable to treatment, when he took his medication as prescribed, we can not say his condition was disabling.

Plaintiff also contends that the ALJ failed to properly consider the residuals he suffered following a seizure, namely fatigue and headaches. Plaintiff contends that he slept between and 12 and 48 hours following a seizure and experienced significant headaches, confusion, disorientation, and loss of memory. Tr. 150-157. He also stated that he could not work for three days following a seizure. In reviewing the medical evidence, we can find no mention of these issues in Dr. Webb's treatment notes. *See Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001)

---

[1] Our research indicates that there are two situations that can cause a person's Dilantin levels to be low. First, the person's body might not be processing the medication correctly. Or, second, the person is not taking the medication as prescribed. We can find no evidence to suggest that plaintiff's body was not absorbing the Dilantin as it should be. The generally accepted level of Dilantin is 10-20 mcg/mL and plaintiff's level was as low as 4.3. *See* Dilantin-125, *at* www.accessdata.fda.gov/drugsatfda_docs/label/2009/008762s036lbl.pdf (September 23, 2010).

10

("The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole."). There are also no hospital records to indicate that plaintiff sought emergency treatment during or following a seizure. While Dr. Webb does list these residual symptoms in the statement he completed regarding plaintiff's seizures, he also admitted that he had never witnessed plaintiff experience a seizure. Additionally, treatment records indicate that he never treated plaintiff immediately following a seizure. As such, it seems clear to the undersigned that Dr. Webb was relying on plaintiff's own subjective complaints when completing his statement. *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) (opinion of consulting physician is not entitled to special deference, especially when it is based largely on claimant's subjective complaints).

After reviewing the record, we also find that plaintiff's anxiety was amenable to treatment. Dr. Webb opined that his condition was well controlled via Xanax. Tr. 239-240. We can find no medical evidence to indicate that plaintiff complained of symptoms associated with anxiety during the relevant time period. *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider). His condition was obviously severe, as he was prescribed Xanax to treat it.[2] However, he reported no problem getting along with authority figures and stated that he visited friends and attended sports events when he felt good. (Tr. 150-157). Further, as previously noted, plaintiff did not

---

[2] We also note that plaintiff's failure to take the Xanax as prescribed could have contributed to him suffering seizures. When Xanax is taken consistently over a long period of time, people can develop an addition to this drug. *See* Xanax, *at* pdrhealth.com (September 23, 2010). When the drug is abruptly stopped, severe withdrawal symptoms including seizures can occur. *Id*.

11

always take the medication as prescribed. *Guilliams*, 393 F.3d at 802. Accordingly, we can not say that plaintiff's anxiety rendered him incapable of performing all work-related activities.

Evidence also indicates that plaintiff injured his back in 2006, while playing. (Tr. 195). Dr. Webb diagnosed him with lumbar pain and muscle spasms and prescribed Percocet. In August 2007, plaintiff reported re-injuring his back during a seizure. (Tr. 241). Again, Dr. Webb prescribed Percocet. It appears that plaintiff continued to take this medication thru at least June 2008. However, there are no x-rays or physical examinations that document plaintiff's alleged back pain. The only records to support his pain are his own subjective complaints. And, it appears as though the Percocet controlled this alleged pain, as he did not make any further complaints of lumbar pain or muscle spasms after the medication was prescribed. In fact, plaintiff continued to work part-time, hanging drywall, in spite of his alleged pain. As such, we do not find plaintiff's back impairment was severe. *Johnston v. Apfel,* 210 F.3d 870, 875 (8th Cir. 2000) (Alleged impairments may not be considered severe when they are stabilized by treatment and otherwise are generally unsupported by medical record).

Although plaintiff reported a history of gangrene in his left leg resulting in frequent falls and loss of consciousness, we can find no evidence to indicate that he sought treatment for this condition during the relevant time period. *See Forte*, 377 F.3d at 895. Further, the record indicates that plaintiff was able to perform work as a dry wall hanger on a part-time basis, complaining that his seizures prevented him from working full-time. There is no evidence to suggest that plaintiff suffered from any physical limitations. As such, we do not find this impairment to be severe.

Plaintiff also contends that the ALJ failed to consider the side effects of his medication. We note, however, that plaintiff failed to report any medication side effects to his doctor. *Zeiler v. Barnhart*, 384 F.3d 932, 936 (8th Cir. 2004) (alleged side effects were properly discounted when plaintiff did not complain to doctors that her medication made concentration difficult). We also note that plaintiff was able to perform very heavy work on a part-time basis while taking these medications. Clearly, had the side effects been severe enough to render him disabled, he would not be able to perform work hanging dry wall, even two days per week.

Plaintiff's own reports concerning his daily activities also undermine his claim of disability. On his function report, plaintiff reported that, on a good day, he tried to work two to four hours. (Tr. 150-157). He stated that he had attempted to babysit his seven month old baby, but recently experienced a seizure while babysitting and had to stop. Plaintiff indicated that he could feed his dog daily, care for his own personal hygiene, drive a car, ride in a car, shop in stores for household items, pay bills, count change, handle a savings account, use a checkbook/money order, fish once every three months or so, watch television, ride ATV's, spend time with others, and attend sporting events when he felt well. *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor).

AO72A
(Rev. 8/82)

Perhaps the most damaging, however, is plaintiff's own admission that he continued to work part-time. On April 1, 2007, plaintiff completed a work activity report indicating that he was self employed providing "labor for cash" services. (Tr. 160-167). He stated that he targeted jobs that were shorter in duration, like a day or less, and performed "lots of different types of labor related jobs for cash."  At the administrative hearing, plaintiff testified that he was still working hanging drywall approximately 2 ½ days per week. (Tr. 27).  He was paid by the foot and made an average of $500.00 per month. (Tr. 23-24). Plaintiff's own attorney described this as "very heavy work."  "Working at a job while applying for benefits are activities inconsistent with complaints of disabling pain." *Dunahoo*, 241 F.3d at 1039; *Wiseman v. Sullivan*, 905 F.2d 1153, 1156 (8th Cir. 1990) (search for work and finding part time employment is inconsistent with disability).  Absent a showing of deterioration, working after the onset of an impairment is at least some evidence of an ability to work.  *See Goff v. Barnhart,* 421 F.3d 785, 793 (8th Cir.2005); *Gowell v. Apfel,* 242 F.3d 793, 798 (8th Cir.2001).

Plaintiff's fiancé, Kimberly Wright appeared and testified on his behalf. Tr. 39-43. Ms. Wright testified that she and plaintiff had been together for 16 years.  During this time, she indicated that plaintiff experienced at least two to three seizures per week, ranging from mild to very intense in severity.  Just prior to a seizure, Ms. Wright stated that plaintiff would clap his hands, roll them, start chomping like he was eating, mumble, and then go into full body convulsions. (Tr. 40). She reported that most seizures lasted from two to four minutes. (Tr. 41). If a tonic clonic seizure lasted longer than five minutes, Ms. Wright testified that she would call an ambulance. (Tr. 42).  However, she denied having to call an ambulance in 2007 or 2008.  (Tr. 43). We note that the ALJ properly considered her testimony but found it unpersuasive.  This

14

determination was within the ALJ's province. *See Siemers v. Shalala*, 47 F.3d 299, 302 (8th Cir. 1995); *Ownbey v. Shalala*, 5 F.3d 342, 345 (8th Cir. 1993).

Plaintiff contends that his failure to seek more consistent treatment and take his medication as prescribed should be dismissed due to economic hardship. Clearly, if the claimant is unable to follow a prescribed regimen of medication and therapy to combat his disabilities because of financial hardship, that hardship may be taken into consideration when determining whether to award benefits. *Tome v. Schweiker,* 724 F.2d 711, 714 (8th Cir.1984). While these hardships can be considered in determining whether to award a claimant benefits, the fact that he is under financial strain is not determinative. *Benskin v. Bowen,* 830 F.2d at 884 n. 1. We can find no evidence to indicate that plaintiff was ever denied treatment or medication due to his financial status. *Goff*, 421 F.3d at 790 (holding that the ALJ correctly discounted the plaintiff's subjective complaints when there was no evidence that the plaintiff was ever denied medical treatment due to financial reasons). Further, we can find no evidence to show that plaintiff sought out any low-cost or indigent medical services that may have been available to him.

**B.     RFC Assessment:**

Plaintiff also contends that the ALJ's RFC assessment is not supported by substantial evidence. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or his RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir.2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or his limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d

15

798, 801 (8th Cir. 2005). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

The ALJ properly considered plaintiff's subjective complaints, the objective medical evidence, Dr. Webb's seizure statement, and the RFC assessment of a non-examining, consultative doctor. On June 11, 2007, Dr. Bill Payne reviewed plaintiff's medical records and completed an RFC assessment. (Tr. 207-214). He concluded that plaintiff had no exertional limitations, but must avoid even moderate exposure to hazards due to seizure disorder. (Tr. 207-214. This assessment was affirmed by Dr. Stephen Whaley on August 9, 2007. Tr. 226-227.

As previously mentioned, plaintiff's treating doctor, Dr. Webb, completed a statement with regard to plaintiff's seizures. When comparing this statement to Dr. Webb's treatment records, it is evident to the undersigned that Dr. Webb relied upon plaintiff's subjective complaints when indicating the frequency of plaintiff's seizures and the residual symptoms he suffered immediately following a seizure. Dr. Webb clearly indicated that he had never witnessed plaintiff experience a seizure. Further, the medical records reveal that plaintiff did not go to the doctor or hospital immediately after experiencing a seizure, such that Dr. Webb would have had the opportunity to observe the residuals of his seizures first hand. Instead, plaintiff presented in Dr. Webb's office the next day or week with reports of having experienced seizures.

16

As such, we can find no error in the ALJ's refusal to grant Dr. Webb's opinion substantial weight.

Plaintiff also complains that the ALJ improperly relied on the RFC assessment completed by Dr. Payne, a non-examining consultant. He contends that the ALJ should have requested an RFC assessment from plaintiff's treating doctor. However, we note that the ALJ had access to plaintiff's medical records dating back to 2001 indicating that plaintiff's EEG, MRI and CT scans were all within normal limits. Tr. 201, 215, 216, 221. Further, he also had access to Dr. Webb's own statement indicating that he had not personally witnessed a seizure. While we note that an RFC assessment from a treating doctor would be preferable, it is not an absolute requirement. And, given the fact that Dr. Webb never personally observed a seizure or treated plaintiff for the residuals he suffered after experiencing a seizure, we do not believe that an RFC assessment from Dr. Webb would have been anymore helpful than was his seizure statement.

To satisfy this step of the evaluation, the ALJ's opinion must merely be supported by "medical evidence that addresses the claimant's ability to function in the workplace." *Lewis,* 353 F.3d at 646. We believe that plaintiff's medical records, coupled with the RFC assessment completed by Dr. Payne and the seizure statement completed by Dr. Webb were enough to enable to the ALJ to make a determination regarding plaintiff's RFC.

We also believe that plaintiff's continued part-time work as a dry wall hanger is also indicative of his ability to perform all levels of exertional work without limitation. Plaintiff's own attorney defined this job as "very heavy work." His testimony indicated that he considered his disability to stem from his seizure disorder and the unpredictable nature of that disorder. It seems clear to the undersigned that, if plaintiff was able to perform very heavy work on a part-

17

time basis, that he should be able to perform any level of exertional activity required to perform a job. However, because he does suffer from seizure disorder, it also seems clear that he would need to avoid exposure to hazards such as unprotected heights or heavy machinery and would not be able to drive as a part of his job. Given that this is the same RFC given by both Drs. Payne and Whaley, we find substantial evidence to support the ALJ's RFC determination.

### C. Testimony of the Vocational Expert:

The final step in the evaluation is the determination of whether the plaintiff can return to his PRW and, if not, whether he can perform other jobs that exist in significant number in the national economy. The hypothetical question posed to a vocational expert need only to include "those impairments that the ALJ finds are substantially supported by the record as a whole." *Id.* (citing *Stout v. Shalala,* 988 F.2d 853, 855 (8th Cir. 1993)); *see also Morse v. Shalala,* 32 F.3d 1228, 1230 (8th Cir. 1994). Testimony from a vocational expert based on a properly-phrased hypothetical question constitutes substantial evidence. *See Cruze v. Chater,* 85 F.3d 1320, 1323 (8th Cir.1996); *cf. Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir.1994) (when hypothetical question does not encompass all relevant impairments, VE's testimony does not constitute substantial evidence to support the ALJ's decision).

Tonya Rutherford Owen, a Vocational Expert ("VE") appeared and testified at the administrative hearing. Tr. 43-46. She identified plaintiff's PRW as very heavy, skilled work. Ms. Owen stated that if the plaintiff were limited to unskilled work he would not be able to return to his PRW. (Tr. 44). The ALJ posed a hypothetical question asking Ms. Owens what jobs would be available for a younger person with a high school education and no exertional limitations who would have to avoid work at heights and on heavy machinery, could not drive,

18

and would be limited to unskilled work. (Tr. 44-45). Ms. Owen indicated that such a person would still be able to perform work as a cashier, mail clerk, janitor, and hand packager. (Tr. 45).

We find that the hypothetical question posed by the ALJ in this case incorporated each of the physical and mental impairments that the ALJ found to be credible, and excluded those impairments that were discredited or that were not supported by the evidence presented. Accordingly, the ALJ's determination that plaintiff could still perform work that exists in significant numbers in the national economy is supported by substantial evidence.

**V.    Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

DATED this 28th day of September 2010.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)